## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

_____
                             )

**PEGGY J. JACKSON,**               )

      **Plaintiff,**              )

      **v.**                      )      **CIVIL NO.  3:08CV182**

**UNITED AIRLINES, INC. &**    )
**TRANS STATES AIRLINES, INC.,**  )

      **Defendants.**          )
_____)

### MEMORANDUM OPINION

This matter is before the Court on multiple motions by Defendants United Airlines, Inc.

("United") and Trans States Airlines, Inc. ("Trans States"), including Trans States' Motion for

Summary Judgment (Docket No. 39), as well as Defendant United's Motion for Summary

Judgment (Docket No. 42) and Motion to Dismiss (Docket No. 41).  Resolution of these motions

initially require the resolution of multiple motions to strike filed by Defendants as to

submissions by Plaintiff in support of her Memorandum in Opposition of the pending dispositive

motions.  The dispositive motions have been fully briefed and argued before the Court, and the

motions to strike are sufficiently pleaded as to not require further oral argument.

### I.  Factual Background[1]

Plaintiff, Peggy J. Jackson, initiated this action against Defendants United Airlines and

Trans States Airlines alleging that she sustained injuries due to the Defendants' negligence and

_____

[1]   All facts and reasonable inferences will be reviewed in the light most favorable to the Plaintiff
as the non-moving party on this motion.  See Seabulk Offshore, Ltd. v. American Home Assur. Co., 377
F.3d 408, 418 (4th Cir. 2004).

failure to comply with the Air Carriers Access Act ("ACAA").  (Compl. ¶ ¶ 10-11.)[2]  On

November 30, 2006, Plaintiff's daughter, Marie Jackson, made travel arrangements for Plaintiff

on the United Airlines website for travel from Sacramento, California to Richmond, Virginia on

January 5, 2007.  (M. Jackson Dep. at 17.)  In order to fly to Richmond from California, Plaintiff

would have to change planes in Chicago, Illinois.  (M. Jackson at 18.)  Marie Jackson notified

United Airlines when she purchased the tickets that her mother would need wheelchair

assistance in Chicago as well as in Richmond.  (Compl. ¶ 6; M. Jackson Dep. at 19; Campuzano

Decl. ¶ 5.)  Although Plaintiff did not normally use any ambulatory assistance devices on a daily

basis, Plaintiff's daughter requested wheelchair assistance for endurance purposes due to the

long day of travel involved.  (M. Jackson Dep. at 19-20.)

On January 3, 2007, Marie Jackson contacted United to confirm the wheelchair request,

because Plaintiff's electronic ticket did not have any indication on it that the request had been

made.  (M. Jackson Dep. at 18-19.)  The United agent who Marie Jackson spoke with confirmed

that the wheelchair request had been made and that assistance had been requested for both

Chicago and Richmond.  (M. Jackson Dep. at 19.)  On January 5, 2007, Marie Jackson escorted

Plaintiff, who would be traveling alone, to the Sacramento airport where Plaintiff commenced

her trip to Richmond.  (M. Jackson Dep. at 24.)  When Plaintiff's first flight arrived in Chicago,

wheelchair assistance was available, and she was assisted to the connecting flight to Richmond.

(Compl. ¶ 6.)

Plaintiff's flight from Chicago to Richmond was United Flight 8042, for which

Defendant Trans States provided the flight crew.  (Basham Decl. ¶ 11.)  Once aboard Flight

---

[2]  All references to the Complaint are to Plaintiff's Amended Complaint, filed on July 14, 2008
(Docket No. 13).

8042, Plaintiff asked the flight attendant, Diane Pongallo, for wheelchair assistance when she arrived in Richmond.  (Pongallo Dep. at 11.)  Pongallo testified in deposition that she notified the pilot that there was a wheelchair request, and that the usual procedure would have been for the pilot to then notify the ground crew of the request.  (Pongallo Dep. at 14, 31.)  However, Pongallo did not know whether the pilot, in fact, made the request. (Pongallo Dep. at 31.)

United Flight 8042 arrived in Richmond at 6:42pm, approximately thirteen minutes ahead of schedule.  (Basham Decl. ¶ 8.)  As the plane was deboarding, Pongallo asked Plaintiff to move to the front of the plane to wait for the wheelchair assistant to arrive.  (Pongallo Dep. at 13-14.)  After all of the other passengers had exited the plane, Plaintiff asked Pongallo how far the baggage claim area was located from the gate.  (Pongallo Dep. at 16.)  Pongallo replied that she did not know the precise distance, but that she should remain on the plane and wait for the wheelchair assistance to arrive.  (Pongallo Dep. at 16.)  Plaintiff told Pongallo that she felt as though she could make her way up the jetway without the wheelchair, and Pongallo advised Plaintiff that if she did so, to sit and wait in the chairs at the top of the jetway for the wheelchair assistance to arrive.  (Pongallo Dep. at 16.)  Pongallo testified that she did not assist the Plaintiff on the jetway, nor did she see anyone from their flight assist her.  (Pongallo Dep. at 16, 39.) Plaintiff maintains, however, that she was accompanied by the co-pilot on the jetway to the gate. (P. Jackson Dep. at 71.)[3]

---

[3]      While each Defendant has moved in limine to preclude the use of the Plaintiff's deposition testimony in lieu of her appearance at trial because she had not, at the time the motions were filed, provided a sufficient basis for the Court to declare her "unavailable" pursuant to Fed. R. Civ. P. 34(a)(4) so as to permit use of the deposition, the Plaintiff is now deceased and therefore the deposition can be utilized pursuant to Rule 32(a)(4)(A) for trial and resolution of the pending motions.  It is also noted that no objection has yet been lodged to the use of Plaintiff's deposition testimony on the basis of her alleged incompetency, and if such an issue is raised hereafter, the Court will then determine whether the deposition evidence can be utilized in its entirety - deferring to the jury's consideration of any claims of

Pongallo testified in deposition that once Ms. Jackson walked out to the gate, she, Pongallo, stayed in the plane to clean and perform her checks for the next flight, following which she walked up the jetway where she saw Plaintiff sitting at the top of the jetway still waiting for the wheelchair service to arrive. (Pongallo Dep. at 17.) Jackson again asked Pongallo how long it would take for the wheelchair to arrive, and Pongallo replied that she did not know, but again encouraged Plaintiff to wait for the wheelchair service before trying to go to the baggage claim area. (Pongallo Dep. at 17.) Pongallo thereupon left Ms. Jackson and proceeded to a nearby restroom. (Pongallo Dep. at 18.) Pongallo testified that when she exited the restroom, she noticed that Plaintiff was walking from the gate B-11 area towards the baggage claim. (Pongallo Dep. at 18.) Once Plaintiff had passed her, Pongallo heard some commotion behind her, turned around, and observed that Plaintiff was on the floor. (Pongallo Dep. at 19.) Pongallo then went to assist Plaintiff. (Id.)

Plaintiff states that she waited approximately thirty minutes on the plane and at the gate before she decided to walk to baggage claim without the assistance of a wheelchair. (P. Jackson Dep. at 74.) Plaintiff claims that while she was waiting at the gate, she was "abandoned," and that all airline personnel had left the plane and the gate area while she sat waiting for wheelchair assistance to arrive. (Compl. ¶ 7; P. Jackson Dep. at 74.) Plaintiff alleges that because of the amount of time that had passed, and the lack of personnel at the gate to ask for further assistance, she decided to walk to the baggage claim area, which resulted in her falling and suffering injury, later determined to be a comminuted fracture of her left shoulder. (Compl. ¶ 7.)

_____

incomprehensibility; whether redacted portions can be used; or nothing at all. In the meantime, however, it being noted that the Defendants have utilized excerpts of Plaintiff's deposition testimony in support of their instant motions, the Court is constrained to consider Plaintiff's use of the same record evidence in support of her opposition to the granting of said motions.

4

Plaintiff's Amended Complaint asserts two claims against United and Trans States that were operating United Flight 8042. First, Plaintiff alleges that the Defendants' actions were in violation of the ACAA by not providing wheelchair assistance to the Plaintiff when she arrived in Richmond. (Compl. ¶ 10.) Additionally, Plaintiff asserts a common law negligence action against the Defendants jointly, arguing that her fall in the airport was the direct result of the Defendants' failure to provide wheelchair assistance, and as such, has caused her severe pain and suffering, leaving her permanently disabled.[4] (Compl. ¶ 10.) The Defendants have filed individual Motions for Summary Judgment, and United has filed an alternative Motion to Dismiss, addressing each of Plaintiff's claims.

## II.  Motions to Strike

Defendants have filed several motions to strike the affidavits submitted by Plaintiff in support of her memorandum in opposition to Defendant's motions for summary judgment. Federal Rule of Civil Procedure 56(e)(1) provides that an affidavit that is submitted in regard to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). In analyzing the sufficiency of an affidavit under this standard, the Court will analyze more than just the affidavit's statement that the affiant is competent to testify in regard to the matter. See Antonio v. Barnes, 464 F.2d 584, 585 (4th Cir. 1972). More specifically, the Court must determine whether there is an affirmative showing in the affidavit itself that the statements therein were made on personal knowledge and based on facts in regard

---

[4] Since the briefing and submission of the current motions before the Court, Plaintiff Peggy J. Jackson has passed away. It is the Court's understanding that, although not yet submitted, Plaintiff's daughter, Marie Jackson, will undertake Plaintiff's claim as the Executor of her mother's estate. As Plaintiff's counsel has confirmed that the claims will remain the same, it is not necessary to await the substitution of parties.

to which the affiant is competent to testify.  See id.  Each of the affidavits and corresponding motions to strike will be analyzed pursuant to this standard.

## A.      Motions to Strike the Affidavit of Morton Clark, Esq.

Morton Clark, Esq., counsel for Plaintiff, has submitted an affidavit in support of Plaintiff's memorandum in opposition to the Defendants' motions for summary judgment that also incorporates a variety of exhibits, including a Durable Power of Attorney executed by Plaintiff and summaries by Mr. Clark of the various depositions taken throughout the course of the litigation. (Docket No. 69.)  The document was filed after the Court's hearing on the pending dispositive motions.  Defendants challenge the Court's consideration of the affidavit on two grounds: first, that it was untimely filed, and thus should not be considered by the Court; and second, is that it fails to satisfy the standards of personal knowledge and competency as required by Fed. R. Civ. Pro. 56(e)(1).  (Trans States' Mem. in Supp. Mot. Strike Clark Aff. "Trans Mem." ¶ ¶ 6-10; United Mem. In Supp. Mot. Strike Clark Aff. "United Mem." ¶ ¶ 6-8.)[5]

The Defendants' first challenge, as to timeliness, must be denied as Mr. Clark's affidavit was filed with leave of the Court.  Pursuant to Federal Rule of Civil Procedure 6(c)(2), a court has the discretion to permit a party to file an affidavit opposing a motion for summary judgment after the deadlines proscribed by Federal and Local Rule.  At the February 10, 2009 hearing, Plaintiff requested leave to file the affidavit to hopefully clarify Plaintiff's position in opposition to the Defendants' dispositive motions.  The Court granted Plaintiff's request, and alerted Defendants that they would be given an opportunity to respond to Plaintiff's additional

---

[5]   As each of the Defendants have provided individual memoranda in support of their pending motions, the Court will utilize the short citation form when referring to the individual submissions, with the understanding that the references refer to the memorandum that corresponds with the motion being discussed by the Court.

submission.  Therefore, the Court will not reject the affidavit on the basis of being untimely submitted.

The Court does agree, however, that the affidavit does not satisfy the requirements set forth in Rule 56(e)(1).  As noted earlier, an affidavit submitted for summary judgment purposes "must be made on personal knowledge" and must set out admissible facts for which the affiant would be competent to testify.  Fed. R. Civ. P. 56(e)(1).  Mr. Clark's affidavit does not satisfy such requirements.  The first of the several documents propounded by Mr. Clark with his affidavit are his summaries of the deposition testimony of Plaintiff, Ms. Marie Jackson, and Ms. Diane Pongallo.  The notes refer to selected excerpts from each of the listed depositions, and, as such, constitute hearsay.  Plaintiff had the opportunity to simply attach or otherwise include the relevant portions of the depositions as exhibits to her memorandum.  Submitted in the present form, however, as summaries of statements made by others, renders the declaration insufficient under Rule 56(e)(1).

In addition to the deposition summaries, Mr. Clark submitted an unauthenticated copy of a Durable Power of Attorney executed by Plaintiff.  Whether the document must also be considered as hearsay is not relevant, at least at this stage, to the Court's determination of the dispositive motions involved.  Lastly, Mr. Clark submitted unauthenticated copies of correspondence that he had with Nicole Caspian, the co-pilot of Flight 8042.  The letter is unauthenticated, and represents hearsay statements which Mr. Clark cannot testify to based on his personal knowledge.  Therefore, Defendants' Motions to Strike the Declarations of Morton Clark (Docket Nos. 70 & 80) are GRANTED.

**B.**     **Motions to Strike the Declaration of Johnie Freeman**

Plaintiff has also submitted the declaration of one Johnie Freeman, an employee of PrimeFlight Aviation Services, Inc. ("PrimeFlight"), who is a Skycap attendant at Richmond International Airport.  (Docket No. 64.)  In his declaration, Mr. Freeman states that on January 15, 2005, he received a telephone call from Marie Jackson who asked several questions regarding the PrimeFlight services offered, whether PrimeFlight contracted with the airport or the airlines, and whether there was any record or log of when wheelchair assistance had been requested in any particular instance. (Freeman Decl. ¶¶ 4-5.)  Plaintiff submitted the declaration on February 9, 2009, one day before the scheduled motions hearing.  Defendants object to the consideration of this declaration on the basis that it was improperly and untimely filed.  (Trans Mem. ¶¶ 6-7; United Mem. ¶¶ 6-7.)

The Federal Rules of Civil Procedure provide that a declaration in opposition to a motion may be filed "at least one day" before the hearing on the relevant motion is to take place.  Fed. R. Civ. P. 6(c)(2).  However, pursuant to Federal Rule of Civil Procedure 83(a)(1), this district has adopted a set of local rules, one of which modifies the time to file affidavits in opposition to pending motions.  See Fed. R. Civ. P. 83(a)(1); see also 28 U.S.C. §§ 2071-2072 (stating that conflicting laws will have no effect once local rules have been properly noticed and adopted).  Specifically, Local Rule 7(F)(1) states that a party opposing a pending motion "shall file a responsive brief and such supporting documents as are appropriate, within eleven (11) days after service . . . No further briefs or written communications may be filed without first obtaining leave of Court."  E.D. Va. Loc. Adm. R. 7(F)(1) (as adopted Nov. 25, 2008).  Here, Plaintiff filed the supporting declaration of Johnie Freeman apart from her Memorandum in Opposition and without first seeking leave of Court, and thus, pursuant to the Local Rules, it is untimely.

8

However, the Local Rules do not provide the final answer as to whether a Court may still consider an untimely pleading, and as noted by the Fourth Circuit, it is permissible for a district court to exercise its discretion and consider an untimely-filed affidavit or declaration if the court determines it is just and proper to do so. See Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993); see also Lovelace v. Lee, 472 F.3d 174, 204 (4th Cir. 2006) (finding it was not an abuse of discretion for district court to consider untimely filed affidavit, although no excuse as to its lateness was presented). Here, Johnie Freeman's declaration offers pertinent facts regarding the case and the issues at hand, as well as information that would aid the Court in its decision making process. As such, the Court finds that the declaration's significance in developing a more complete record and promoting a full and fair determination of the relevant issues outweighs the fact that Plaintiff filed the supporting document in an untimely fashion. Therefore, Defendants' Motions to Strike the Declaration of Johnie Freeman (Docket Nos. 74 & 83) are DENIED.

In addition to Defendants' motions to strike the declaration of Johnie Freeman, both Defendants filed related motions to strike the corrections as to Johnie Freeman's declaration (Docket No. 64) which were submitted by Plaintiff's Counsel, Terrence G. Haglund, Esq. (Docket Nos. 91 & 95.) Defendants assert that the corrections proffered by Mr. Haglund are inappropriate as they were untimely submitted, and because the corrections are not based on personal knowledge, while also asserting facts that would not be admissible into evidence. (Trans Mem. ¶¶ 7-8; United Mem. ¶¶ 7-8.) While recognizing that the affidavit is not in the appropriate form, the Court will nevertheless accept the corrections proffered by Mr. Haglund's declaration, as the Court granted Plaintiff's counsel leave to file such corrections and deems that it is proper and just to do so in order to develop a full and accurate record. Therefore,

9

Defendants motions to strike the clarifications made to Johnie Freeman's declarations (Docket Nos. 91 & 95) are DENIED.

**C.      Motions to Strike the Declaration of Terence G. Haglund, Esq.**

In addition, Plaintiff submitted the declaration of Terence G. Haglund, Esq. (who jointly represents her), in support of her Memorandum in Opposition to Defendants' motions for summary judgment.  (Docket No. 65.)  In his declaration, Mr. Haglund outlines his communications with personnel at PrimeFlight, the company which contracts with the airlines at Richmond International Airport to provide wheelchair assistance when it is requested on behalf of or by airline passengers.  (Haglund Decl. ¶ ¶ 3-18; Manning Decl. ¶ 3.)  Plaintiff submitted the declaration on February 9, 2009, again, one day before the scheduled motions hearing. Defendants also object to consideration of Mr. Haglund's declaration on the basis that it was untimely and improperly filed, and that it contains conclusory and otherwise inadmissible statements that should not be considered by the Court.  (Trans Mem. at ¶ ¶ 6-9; United Mem. at ¶ ¶ 6-9.)

As discussed earlier herein, Local Rule 7(F)(1) requires that a memorandum in opposition to a motion for summary judgment must be filed within eleven days after service of the motion, and that it must contain appropriate supporting documents.  Here, Plaintiff filed the supporting declaration of Terence G. Haglund apart from her Memorandum in Opposition and without first seeking leave of Court, and thus, pursuant to the Locals Rules, it was untimely and improperly submitted.  Although, as previously noted, it is permissible for the Court to exercise its discretion and consider the document, such discretion should only be exercised on a limited basis, and as such, the Court will only do so if the information provided within the submission contributes to developing a more full and accurate record.  In reviewing Mr. Haglund's

10

declaration, it appears that much of the information provided must be considered as hearsay, or not otherwise admissible due to Mr. Haglund's lack of personal knowledge of the information contained in it.  Although this Court recognizes its authority to redact the impermissible portions of the declaration, it nevertheless appears to the Court that such a redaction would leave the declaration without meaningful substance that would not contribute to furthering the Court's inquiry in regard to the pending motions for summary judgment.  Accordingly, the declaration of Terence G. Haglund, Esq. will not be considered by the Court, and Defendants' motions to strike the declarations of Terence G. Haglund (Docket Nos. 72 & 81) will be GRANTED, while Defendants' motions to strike the declaration of Terence G. Haglund, Esq. to correct his previous declaration (Docket Nos. 93 & 97) will be DENIED AS MOOT.

### III.   Motions for Summary Judgment and Motion to Dismiss

**A.     Standards of Review**

    1.     Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.  Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitled him to relief." Conley, 355 U.S. at 45-46.  In Bell Atlantic Corp., the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  550 U.S. at 555 (citations omitted).  Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id.  Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickenson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002)).

    2.    Motion for Summary Judgment

Pursuant to Rule 56© of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. Id. at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48 (emphasis in original). Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. Lewis v. City of Va. Beach Sheriff's Office, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

Furthermore, a "material fact" is a fact that might affect the outcome of a party's case. Anderson, 477 U.S. at 247-48; JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S.

at 248; see also Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material" fact only arises when the evidence, when viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable jury to return a verdict in that party's favor.  Anderson, 477 U.S. at 248.

## B.     Trans States' Motion for Summary Judgment and United's Motion to Dismiss as to Plaintiff's ACAA Claims

Trans States in its Motion for summary Judgment, and United in an alternate Motion to Dismiss, assert that dispositive relief should be granted as to Plaintiff's ACAA claims because no private right of action exists pursuant to the Act.  (Trans Mem. at 8; United Mem. at 3-4.)[6] Specifically, Defendants assert that private rights of action must be established by Congress, and in interpreting the ACAA, no private right of action has been created explicitly, or impliedly. (Trans Mem. at 8-10; United Mem. at 4, 7.)  In response, Plaintiff does not appear to necessarily disagree.  Indeed, she concedes that "it is questionable whether the ACAA creates a private right of action."  (Pl.'s Mem. at 4.)  However, Plaintiff does argue that there is some limited case precedent supporting the premise that a private right of action does exist under the ACAA.  (Pl.'s Mem. at 4.)  The Court must resolve then whether at least an implied private right of action exists pursuant to the ACAA.

The ACAA provides that an air carrier:

[m]ay not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities; (2) the individual has a record of such an impairment; (3) the individual is regarded as having such an impairment.

49 U.S.C. § 41705(a).  However, various courts have concluded that it is "indisputable that the ACAA does not expressly provide a private entitlement to sue in district court."  Love v. Delta

---

[6] All memorandum citations in this section reference Docket Numbers 39 and 41.

<u>Airlines</u>, 310 F.3d 1347, 1354 (11th Cir. 2002) (citing <u>Shinault v. Am. Airlines, Inc.</u>, 936 F.2d 796, 800 (5th Cir. 1991); <u>Tallarico v. Trans World Airlines, Inc.</u>, 881 F.2d 566, 568 (8th Cir. 1989)).  However, more recently, the Supreme Court has modified the standard for analyzing whether implied private rights of action exist, and, accordingly, there has been debate as to whether an implied private right of action exists pursuant to the ACAA.

It is clearly established that private rights of action to enforce federal laws must be created by Congress.  See <u>In re Miller</u>, 124 F. App'x 152, 154 (4th Cir. 2005) (citing <u>Alexander v. Sandoval</u>, 532 U.S. 275, 286-87 (2001)).  However, in situations where an explicit private right of action is not specified, courts may interpret the structure and language of the statute to determine if an implied right of action was nevertheless intended by Congress.  See <u>Sandoval</u>, 532 U.S. at 286. In conducting such an analysis, the Supreme Court has articulated four factors that must be considered by a court: (1) is the plaintiff one of the class for whose especial benefit the statute was enacted - - that is, does the statute create a federal right in favor of the plaintiff?; (2) is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?; (3) is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the Plaintiff?; and (4) is the cause of action one traditionally relegated to state law, within an area basically the concern of the states so that it would be inappropriate to infer a cause of action based solely on federal law?  <u>In re Miller</u>, 124 F. App'x at 154 (quoting <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975)).

In recent years, the analysis in relevant case law has shifted somewhat, with the inquiry centered primarily on whether Congress intended to create a federal cause of action.  See <u>id.</u>  The Supreme Court held in <u>Alexander v. Sandoval</u> that statutory intent is "determinative" and that "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how

15

desirable that might be as a policy matter, or how compatible with the statute."  532 U.S. at 286-87 (citations omitted).  Although the other factors are still to be considered, the issue of Congressional intent has become the key to the analysis.

Only two circuit courts have analyzed the issue of whether a private right of action exists under the ACAA since the Supreme Court's <u>Sandoval</u> decision.  Focusing primarily on the language and structure of the ACAA, both the Tenth and Eleventh Circuit Courts of Appeals have held that no implied private right of action exists under the statute.  See <u>Boswell v. Skywest Airlines</u>, 361 F.3d 1263 (10th Cir. 2004); <u>Love v. Delta Air Lines</u>, 310 F.3d 1347 (11th Cir. 2002).  In <u>Love</u>, the Eleventh Circuit explained that a private right of action could not be implied under the ACAA because the statute dictates an "elaborate and comprehensive enforcement scheme" which does not include a private right to sue in federal court.  310 F.3d at 1354. Specifically:

> the ACAA and its attendant regulations provide three separate enforcement mechanisms.  First, the [Department of Transportation ("DOT")] is required to investigate ACAA claims and is given broad powers to sanction air carriers for ACAA violations.  Second, air carriers themselves are required to establish ACAA dispute resolution mechanisms.  Finally, once the DOT has acted in response to an alleged ACAA violation, an individual 'with a substantial interest' in that action may seek review in a court of appeals.

<u>Id.</u> at 1357.  The <u>Love</u> court found that such explicit and elaborate enforcement mechanisms "undermine the suggestion that Congress also intended to create by implication a private right of action in a federal district court but declined to say so expressly."  <u>Id.</u> (citing <u>Sandoval</u>, 532 U.S. at 290).  While the Eleventh Circuit noted that other aspects of the ACAA might suggest a private right of action, the explicit and elaborate enforcement scheme that is provided precludes a finding that an implied right, in fact, exists.  <u>See id.</u> at 1358.

Shortly after the <u>Love</u> opinion was issued, the Tenth Circuit reviewed the same issue in <u>Boswell v. Skywest Airlines, Inc.</u>  The Tenth Circuit analyzed the Supreme Court's recent decisions regarding implied rights of actions and reiterated that the four factors outlined by the Supreme Court in <u>Cort v. Ash</u> had "been effectively condensed into one – whether Congress expressly or by implication, intended to create a private cause of action."  <u>Boswell</u>, 361 F.3d at 1267.  Utilizing that standard, the court adopted the Eleventh Circuit's analysis in <u>Love</u>.  <u>Id.</u> at 1269.  The Tenth Circuit explained that "'[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'"  <u>Id.</u> (citing <u>Sandoval</u>, 532 U.S. at 290).  As such, the court held that the enforcement scheme dictated by the ACAA precludes the application of an implied private right of action under the Act.  <u>See id.</u> at 1270.

Since the <u>Love</u> and <u>Boswell</u> decisions, many district courts have applied the same analysis in holding that a private right of action does not exist under the ACAA.  <u>See, e.g.</u>, <u>Thomas v. Northwest Airlines Corp.</u>, No. 0811580, 2008 WL 4104505 (E.D. Mich. Sept. 2, 2008) (finding Supreme Court decision in <u>Sandoval</u> directed a finding that no private right of access exists under ACAA); <u>Wright v. American Airlines, Inc.</u>, 249 F.R.D. 527 (E.D. Mo. 2008) (adopting <u>Love</u> analysis to find no private right of action under ACAA); <u>Chipps v. Continental Airlines, Inc.</u>, No. 3:05-cv-2024, 2006 WL 463160 (M.D. Pa. Feb. 24, 2006) (finding the ACAA's comprehensive enforcement scheme precludes finding a private right of action).  Although some circuit court decisions have held that a private right of action exists under the ACAA, all of the cases were decided before the Supreme Court's <u>Sandoval</u> decision, and have therefore been discounted as being effectively overturned.

Given the most recent case law governing implied rights of action, and the language and structure of the ACAA, this Court adopts the Tenth and Eleventh Circuits' analysis in finding

that no private right of action exists under the Act.  As such, Defendant Trans States' Motion for Summary Judgment as to Plaintiff's ACAA claims is GRANTED; Defendant United's Motion to Dismiss is GRANTED,  and the alternative argument in its Motion for Summary Judgment as to Plaintiff's ACAA claims is DENIED AS MOOT.

**C.      Defendant Trans States' and United's Motions for Summary Judgment as to Plaintiff's Common Law Negligence Claims.**

Defendants' additional arguments address Plaintiff's common law negligence claim. Specifically, Defendants assert that Plaintiff is unable to establish a prima facie case of negligence, and, therefore, dispositive relief should be granted.  (Trans Mem. at 13-14; United Mem. at 13.)

To establish a prima facie negligence claim pursuant to Virginia law, Plaintiff must establish that Defendants owed her a legal duty, that there was a breach of that duty, and that the breach of duty was the proximate cause of injury that resulted in damage to the Plaintiff.  See Blue Ridge Service Corp. of Va. v. Saxon Shoes, Inc., 271 Va. 206, 218 (2006) (citing Trimeyer v. Norfolk Tallow Co., 192 Va. 776, 780 (1951)).  Here, Defendants offer two arguments regarding Plaintiff's negligence claim: (1) Defendants' assert that they did not owe Plaintiff any duty while she was in the airport terminal, or alternatively, that any duty owed to Plaintiff was not breached; and (2) that if Defendants did breach a duty owed to Plaintiff, that their actions were not the proximate cause of Plaintiff's injuries.  (Trans Mem. at 13-19; United Mem. at 13-21.)  As each of Defendants' arguments have a separate analysis, they will be addressed in turn.

1.      Duty Owed by Defendants to Plaintiff, and Breach of Such Duty

18

It is well established in Virginia law that common carriers[7] owe a heightened duty of care to their passengers.  See Taboada v. Daly Seven, Inc., 271 Va. 313, 325 (2006); Shamblee v. Virginia Transit Co., 204 Va. 591, 593 (1963).  Specifically, "a common carrier of passengers for hire by air is under a duty to exercise the highest degree of care for the safety of its passengers compatible with the normal prosecution of its business."  Commonwealth v. United Airlines, Inc., 219 Va. 374, 385 (1978).  An elevated duty of care is imposed on common carriers "because the passenger entrusts his safety to the carrier" who better knows the "dangers of the neighborhoods and environs through which the routes of travel may lie."  Taboada, 271 Va. at 325.  While this heightened duty of care does not make the common carrier an insurer of a passenger's safety, the carrier is still "liable for the slightest negligence that such care could have foreseen and guarded against."  Shamblee, 204 Va. at 594 (citing Tri-State Coach Corp. v. Stidham, 191 Va. 790, 795 (1951); Crist v. Coach Co., 196 Va. 642, 645 (1955)).  It is in light of this standard that we view the relationship between Defendants and Ms. Jackson.

Defendants assert that they did not owe a duty to Plaintiff to provide wheelchair services, particularly in light of her ability to walk from the airplane to the terminal, and that once Plaintiff arrived safely in the terminal, that they did not owe her any further duty to ensure that wheelchair services were provided.  (Trans Mem. at 14-16; United Mem. at 13-17.)  In support of their argument, the Defendants cite to cases establishing the general principle that "courts in Virginia and elsewhere have generally held that a carrier's duty of the highest degree of practical care does

---

[7] "'A common carrier [is] defined as one who, by virtue of his calling and as a regular business, undertakes for hire to transport persons or commodities from place to place, offering his services to all such as may choose to employ him and pay his charges.'"  Bregal v. Busch Entertainment Corp., 248 Va. 175, 177 (1994) (citations omitted).  Defendants' concede that they act as common carriers and that the heightened duties owed by common carriers apply in this case.  (Trans Mem. at 15; United Mem. at 14.)

not extend to the . . . station premises."  See Jones v. Wash. Metro. Area Transit Auth., 378 F.

Supp. 2d 718, 722 (2005) (citing Cleveland v. Danville Traction & Power Co., 179 Va. 256, 259-

60 (1942)) (emphasis added).  Instead, once a passenger has reached "a place of safety," the

heightened standard usually reserved for common carriers is alleviated, and replaced with a

standard of ordinary care.  See id. at 722-23.  The rationale behind the general principle stems

from the relationship between the carrier and the passenger, and the idea that once having

departed the carrier's vehicle, the carrier no longer serves, effectively, as the bailee of the

passenger's person. See Cleveland, 179 Va. at 259-60 (citations omitted).  Thus, courts "often

frame[] the question of a carrier's duty of care to a particular plaintiff in terms of the passenger-

carrier relationship, holding the duty of the highest degree of practical care applicable only when

the plaintiff could be considered the 'passenger' of the defendant carrier at the moment the

injured sued upon was sustained."  Jones, 378 F. Supp. 2d at 722.

        In viewing the facts in a light most favorable to Plaintiff, as the Court must do to resolve

the pending motion, the Court finds that the carrier/passenger relationship between the Plaintiff

and the Defendants extended beyond the threshold of the plane, as Defendants undertook

affirmative acts which extended their duties to Plaintiff beyond the plane's threshold.   It is clear

that "[t]he relation of carrier and passenger does not terminate until after the passenger has

alighted from the conveyance and has had reasonable opportunity to reach a place of safety," and

given the affirmative acts and assurances of the Defendants that wheelchair assistance would be

provided, the common carrier duty to provide the "highest degree of care" did not shift to one of

ordinary care once Plaintiff reached the terminal.  Tri-State Coach Corp., 191 Va. at 795.

Defendants continually assured Plaintiff that wheelchair assistance would be provided for her

when she arrived in Richmond, both before she began her journey, as well as during her travel,

and again once she arrived in Richmond.  (M. Jackson Dep. at 19; Pongallo Dep. at 14; Pongallo Dep. at 17.)  Once the plane arrived in Richmond, Ms. Pongallo told Plaintiff that wheelchair assistance had been requested, and although she could not tell Plaintiff when assistance would arrive, she did inform her that assistance was on the way.  (Pongallo Dep. at 13-14; 16.) Additionally, although Plaintiff decided to wait for the wheelchair in the terminal, and informed Ms. Pongallo that she did not need assistance to the terminal, the deposition testimony of at least the Plaintiff indicates that one of the crew (the co-pilot) nevertheless may have accompanied Ms. Jackson into the terminal.  (P. Jackson Dep. at 71.)

Once in the terminal, Ms. Pongallo again encouraged Plaintiff to sit and wait for wheelchair assistance to arrive. (Pongallo Dep. at 17.)  Given such affirmative acts, which extend beyond the threshold of the aircraft, and the reasonable inference that should have been drawn by the Defendants' agent that a wheelchair may not be on its way given the amount of time that had passed, the Court finds that the Defendants' heightened duty of care extended beyond the aircraft and continued, as their relationship with Plaintiff did, as Plaintiff moved into the terminal area. Thus, although Plaintiff had arrived safely into the terminal, Defendants continued to owe Plaintiff the duty to exercise the highest degree of care for her safety, given their continued assistance and assurances.  Based on the applicable standard and the evidence presently available, the Court finds that there is sufficient evidence present for jury resolution of whether Defendants breached the duty owed to Plaintiff, particularly given that an outstanding question of fact remains as to whether there were other personnel present from whom Ms. Jackson could have asked for assistance when the wheelchair did not arrive, once Ms. Pongallo left the immediate area.

Lastly, even if, as the Defendants assert, their duty shifted to the less-heightened standard of ordinary care once Plaintiff had safely reached the terminal, this Court's determination that a duty existed between Plaintiff and Defendants while she was in the terminal, and that a jury could determine, based on the evidence, that such a duty was breached, would remain unchanged.  Even given a duty of ordinary care, it was reasonably foreseeable, given the time that had expired, that wheelchair assistance was not, as Defendants thought, en route.  It was also reasonably foreseeable, given Plaintiff's continuous requests for wheelchair assistance, that if skycap services did not respond, and there was no airline personnel available at the gate to offer continuing assistance, that Plaintiff may be placed in a situation where she was forced to exercise her own efforts into harm's way.  Therefore, under either an ordinary care or heightened duty of care analysis, it is clear, based on the evidence currently before the Court that Defendants did owe Plaintiff a duty based on their own affirmative acts that transpired beyond the threshold of the plane, and that sufficient evidence and disputed material facts exist for a jury to determine whether Defendants breached that duty.  Thus, summary judgment must be denied.

      2.    <u>Defendants Actions as Proximate Cause of Plaintiff's Injuries</u>

Defendants' final argument is that even if they breached a duty owed to Plaintiff during her travels, their actions, or inactions, were not the proximate cause of Plaintiff's injuries.  (Trans Mem. at 16-19; United Mem. at 17-22.)  Instead, Defendants assert that Plaintiff's decision to leave the airplane and, subsequently, the gate area on her own initiative was an intervening act which directly caused her injuries, and as such, Defendants cannot, as a matter of law, be liable for the resulting damage caused to Plaintiff from her injuries when she fell in the airport terminal. (Trans Mem. at 18-19; United Mem. at 21.)

Proximate cause is defined as the factual and legal causation which links the breach of a Defendant's duty to the injury suffered by the Plaintiff.  See Sugarland Run Homeowners Assoc. v. Halfmann, 260 Va. 366, 372 (2000); Wells v. Whitaker, et al., 207 Va. 616, 622 (1966).  More specifically, "[t]he proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred."  Blue Ridge Service Corp. of Va. v. Saxon Shoes, Inc., 271 Va. 206, 218 (2006) (citing Beale v. Jones, 210 Va. 776, 780 (1951)).  It is not sufficient for a Plaintiff to show injury alone; instead, the Plaintiff must demonstrate that the negligence of the wrongdoers was the cause of the injuries suffered.  See Carolina, Clinchfield & Ohio Railroad Co. v. Mullins, 207 Va. 207, 212-13 (1966).

In certain instances, there may be more than one proximate cause of an event which may or may not relieve a defendant of liability for its/his own negligence.  See Williams v. Le, 276 Va. 161, 167 (2008).  "'In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury.'"  Id. (quoting Atkinson v. Scheer, 256 Va. 448, 454 (1998)).  Additionally, the intervening act, itself, may not be "a happening that ought to have been foreseen," and, furthermore, "[a]n intervening cause does not operate to exempt a defendant from liability if that cause is put into operation by the defendant's wrongful act or omission."  Id. (quoting Jefferson Hosp., Inc. v. Van Lear, 186 Va. 74, 81 (1947)); Koutsounadis v. England, 238 Va. 128, 132 (1989) (citations omitted).

Whether a causal connection exists between a defendant's negligence and a plaintiff's injuries is usually a question reserved for the jury.  See Edgerton v. Norfolk Southern Bus Corp.,

23

et al., 187 Va. 642, 653 (1948).  "'It is only when men of reasonable minds may not fairly differ on the proper inferences to be drawn from the facts proved that it becomes a law for the court.'"  Id. (citations omitted).  It is under these guiding principles that the Court analyzes Defendants' arguments that their actions were not the proximate cause of Ms. Jackson's injuries.

In support of their argument that their actions, or inaction, were not the proximate cause of Plaintiff's injuries, Defendants cite three cases in which courts determined that the defendant airline's failure to provide wheelchair assistance was not the proximate cause of subsequent injuries sustained by the plaintiff involved. (Trans Mem. at 17-18; United Mem. at 18-21.)  In Nethaway v. N.W.A., Inc., a ninety-four year old Plaintiff was traveling with her daughter who had requested wheelchair assistance before and during their flight.  See Case No. 97-CV-70878-DT, 1997 WL 33564932, at *1 (E.D. Mich. Nov. 19, 1997).  When plaintiff's flight arrived at her connecting destination, wheelchair assistance had not yet arrived at the gate, and Plaintiff and her daughter thereupon walked together into the terminal to inquire about the wheelchair request.  See id.  When plaintiff and her daughter reached the terminal, plaintiff's daughter went to speak with an airline official about the wheelchair request.  See id.  Plaintiff, while waiting, spotted an available cart and started walking toward it.  See id.  While walking away, plaintiff's daughter cautioned her mother to wait with her, and Plaintiff turned, slipped and fell, breaking her hip.  See id.

The court in Nethaway found that no proximate cause existed, explaining that "[a]lthough defendant's failure to provide plaintiff with a wheelchair immediately upon exiting the plane may have raised the possibility of an injury, this Court fines that plaintiff's injury was not the natural and probable result of defendant's failure."  Id. at *2.  The Court further explained that plaintiff chose not to wait for the wheelchair, and "[o]nly after she elected to walk away from the

24

Northwest counter did she experience the negligence of third-parties who allegedly failed to properly maintain the concourse floors." Id.  Unlike the case currently before this Court, the plaintiff in Nethaway did not have the same relationship with the airline as Ms. Jackson had with the Defendants, and particularly, the personnel on Flight 8042.  It appears that in Nethaway, that plaintiff and her daughter did not wait on the plane for any period of time before deciding to walk to the terminal.  Additionally, it appears that the plaintiff in Nethaway was assisted by her daughter when exiting the plane; and, furthermore, that airline personnel were available at the gate with whom plaintiff could have asked for assistance if she had chosen to do so. Given such factual distinctions, it appears that the Nethaway court's decision is not sufficiently persuasive relative to the situation in this case.

The other two cases cited by Defendants in support of their motions for summary judgment involve factual scenarios in which specific intervening causes were identified by the deciding courts.  In Rachal v. American Eagle Airlines, Inc., the Plaintiff had requested wheelchair assistance, and when her flight arrived at her destination, wheelchair assistance had not arrived at the gate.  See Case No. 2-04-102-CV, 2005 WL 675566, at *1 (Tex. App. March 24, 2005).  Plaintiff waited thirty minutes, and when a wheelchair was not provided, plaintiff decided to walk to baggage claim unassisted.  See id.  To get to baggage claim, plaintiff was required to take either an escalator or an elevator, and despite the availability of the elevator, plaintiff chose to utilize the escalator.  See id.  When on the escalator, it malfunctioned, causing plaintiff to fall and sustain injuries.  See id.  In explaining that defendant's failure to provide wheelchair assistance was not the proximate cause of plaintiff's resulting injuries, the court found that "American Eagle's failure to provide wheelchair assistance was too attenuated from Rachal's fall on the escalator to be a substantial factor in bringing about Rachal's injury and merely created

the condition that made her injury possible." Id. at *3.  The court further explained that Rachal's injury would not have occurred without other intervening causes, including her decision to walk unassisted to the baggage claim area, her failure to determine that an elevator was available, and the escalator's malfunction.  See id.  As such, the court granted summary judgment as to plaintiff's negligence claims against the airline.

Similarly, in Glatfelter v. Delta Airlines, Inc., plaintiff was traveling with his wife from Connecticut to Florida, with a stop in Atlanta, for which they had requested wheelchair assistance to reach their connecting gate.  See 558 S.E.2d 793,796 (Ga. App. 2002).  Due to bad weather, the plaintiff's flight did not arrive on time, and plaintiff and his wife were unable to make the connecting flight.  See id.  When plaintiff's first flight arrived at the gate, there was no wheelchair waiting for them, so plaintiff and his wife walked to the gate to speak with an airline agent.  See id.  Plaintiff learned that he could make a later connecting flight, which would depart from a different concourse.  See id.  Plaintiff requested wheelchair assistance to the alternate gate; however, none was readily available, and there were no open seats on any passing tram.  See id.  After waiting approximately fifteen to twenty minutes, plaintiff and his wife decided to walk to the other concourse.  See id.  Plaintiff was required to ride an escalator to get to the concourse, which was crowded, and as he made his way down, he was pushed over by a surge in the crowd.  See id.  In finding that plaintiff's injuries from the escalator fall were not proximately caused by defendant's failure to obtain wheelchair assistance for plaintiff, the court held that plaintiff's injuries were the result of other intervening events for which the injuries would not have occurred.  See id.  Specifically, the court found that plaintiff's decision to walk to the alternate concourse, their failure to determine that an elevator was available, and the crowd "surge" were intervening causes that negated defendant's liability.  See id. at 797.

Unlike those situations, the facts established in the record currently before the Court do not reveal, as a matter of law, a distinct intervening cause. Specifically, when viewed in the light most favorable to the Plaintiff, there is a reasonable question of whether Plaintiff's exiting the plane, and thereafter, walking away from the gate, were part of the reasonable and foreseeable chain of events. Once Flight 8042 arrived in Richmond, Plaintiff was asked by the flight attendant, Ms. Pongallo, to move to the front of the plane to sit and wait for a wheelchair to arrive. (Pongallo Dep. at 13-14.) Plaintiff asked Ms. Pongallo how far the baggage claim area was, and was told that the flight attendant did not know, but that Plaintiff should stay on the plane and wait for wheelchair assistance to arrive. (Pongallo Dep. at 16.) Soon after, Plaintiff stated that she was able to make her way up to the terminal to wait for the wheelchair to arrive at the gate. (Pongallo Dep. at 16.) However, it becomes unclear whether Plaintiff was then escorted up the ramp by one of the flight's crew members, or whether she walked up the ramp unassisted. (Pongallo Dep. 16, 39; P. Jackson Dep. at 71.) The facts also demonstrate that once in the terminal, Ms. Pongallo, after having completed her checks and cleanup of the plane, walked into the terminal and again spoke with Plaintiff. (Pongallo Dep. at 17.) At that time, Plaintiff again asked how long it would take for the wheelchair to arrive, and Pongallo replied that she did not know, but encouraged Plaintiff to continue waiting. (Pongallo Dep. at 17.) At that point, Ms. Pongallo left the gate area to go to a restroom, leaving Plaintiff at the gate, apparently, with no other airline personnel available to assist her should wheelchair assistance not arrive. (Pongallo Dep. at 18; P. Jackson Dep. at 74.) Given such facts based on the present record, a question remains, if Plaintiff was indeed left at a gate where no airline personnel were available, how long a person must wait for necessary assistance before it becomes reasonable and foreseeable for them to initiate their own action to attempt to walk away on their own. The question, based on

27

facts and circumstances in regard to which reasonable minds could differ, must be left for jury determination.  Accordingly, dispositve relief cannot be granted on this basis.

## IV.  <u>Conclusion</u>

Finding that there is no private right of action under the ACAA, but nevertheless finding that Plaintiff has established sufficient facts to create a genuine issue of disputed material fact as to her common law negligence claims, Defendant Trans States' Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART, and Defendant United's Motion to Dismiss will be GRANTED, with its motion for summary judgment being DENIED AS MOOT IN PART and DENIED IN PART.

An appropriate order shall issue.


_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge


Dated: April 17, 2009
Richmond, Virginia